### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **BRIAN BAIER,** | : | **CASE NO. 1:24-cv-276** |
| | : | |
| **PLAINTIFF,** | : | **JUDGE HOPKINS** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **COMMUNITY HOME HEALTH CARE,** | : | **PLAINTIFF'S MEMORANDUM IN** |
| **INC.,** | : | **OPPOSITION TO DEFENDANT'S** |
| | : | **MOTION TO DISMISS PLAINTIFF'S** |
| **DEFENDANT.** | : | **FIRST AMENDED COMPLAINT** |

Now comes Plaintiff Brian Baier ("Plaintiff"), by and through counsel, and submits this Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. For the reasons that follow, Defendant's Motion should be overruled in its entirety.

### <u>MEMORANDUM IN OPPOSITION</u>

### I.    STANDARD OF REVIEW

To survive a motion to dismiss under Civ.R. 12(B)(6), the complaint must contain enough facts to state a claim for relief that is plausible on its face. *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 U.S. Dist. LEXIS 100780, *10, (S.D. Ohio, June 15, 2018) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The moving party bears the burden of showing that the opposing party has failed to adequately state a claim for relief. *Id.* at *9 (citing *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). When construing a motion to dismiss pursuant to Civ.R. 12(B)(6), "the court must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party." *Fisher v. Ahmed*, 2020-Ohio-1196, 153 N.E.3d 612, ¶ 9, (9th Dist.) (citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988)).

1

Before a court may dismiss the complaint, "it must appear beyond doubt that plaintiff can prove no set of facts entitling [him] to recovery." *O'Brien v. University Community Tenants Union, Inc*., 42 Ohio St. 2d 242, 245, 327 N.E.2d 753 (1975) (emphasis added). Therefore, as long as there is a set of facts, consistent with Plaintiff's Amended Complaint, which would allow him to recover, a court may not grant a motion to dismiss. *See Id*.; See also *York v. Ohio State Highway Patrol*, 60 Ohio St. 3d 3143, 144-145, 573 N.E.2d 1063 (1991) (further elaborating that the plaintiff need not prove its case at the pleading stage).

## II.   ARGUMENT

### A.  Plaintiff Suffered Retaliation in Violation of the False Claims Act

The False Claims Act ("FCA") "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003).  The FCA provides anti-retaliation protection to private individuals who bring fraud to the government's attention, and to individuals who try to stop the fraud itself. 31 U.S.C. § 3730(h)(1). To protect employees who expose fraud against the federal government, the FCA's anti-retaliation provision forbids discharging an employee "because of lawful acts done […] in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter." 31 U.S.C. § 3730(h). "Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims. The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive." *Jones-McNamara v. Holzer Health Sys.*, 630 F.App'x 394 (6th Cir.2015).

Direct evidence is "evidence, which if believed, does not require an inference that unlawful retaliation motivated an employer's action." *Spengler v. Worthington*, 615 F.3d 481, 491 (6th Cir. 2010). Where a plaintiff produces direct evidence of retaliation, "the burden of both production

2

and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

"Where a plaintiff proceeds with circumstantial evidence of retaliation, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) applies. Under the *McDonnell-Douglas* test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation." *Jones-McNamara,* 630 F.App'x 394, at 398. In order to establish a prima facie case of retaliatory discharge under the FCA, a plaintiff must show that "(1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc*., 341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513-14 (6th Cir. 2000). "Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Jones-McNamara,* 630 F.App'x 394, at 398. (Internal Citations Omitted).

### 1. The Plaintiff Engaged in Protected Activity

The Sixth Circuit held in *McKenzie v. BellSouth Telecommunications, Inc.*, that internal reports of fraud may constitute protected activity under the FCA so long as they "allege activity with a nexus to a *qui tam* action, or fraud against the United States government." 219 F.3d 508, 516 (6th Cir. 2000). "The anti-retaliation section interpreted in *McKenzie* was amended in 2009 by expanding the subsection to also protect 'other efforts to stop one or more violations of' the FCA,

3

rather than only conduct that was in 'furtherance of an action under' the FCA." *Miller v. Abbott Laboratories*, 648 F.App'x 555, 559 (6th Cir.2016); *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012); *see also* 155 Cong. Rec. E1295-03, E1300 (June 3, 2009) (statement of Rep. Berman) ("This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.").

"Therefore, pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual qui tam action is no longer applicable." *Miller, supra, 648* F.App'x 555, at 560; *See Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015) ("[T]he requirement that conduct could develop into a 'viable FCA action' no longer accurately reflects the statutory language."). "The amended statutory language also explicitly confirms *McKenzie*'s recognition that § 3730(h) protects internal reports of, or other efforts to stop, fraud on the government." *Miller*, *648* F.App'x at 560; *See McKenzie*, 219 F.3d at 515.

"The Sixth Circuit has held that 'protected activity' should be interpreted broadly." *Kachaylo v. Brookfield Twp. Bd. of Trustees*, 778 F.Supp.2d 814 (N.D.Ohio 2011) The Sixth Circuit in *Miller* held:

> [The FCA] protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual *qui tam* action.

*Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016) (citation omitted). Thus, "where an employee works to stop an employer's FCA-related misconduct, a protected activity exists, regardless of whether it occurs through 'external means (e.g., an FCA action) or […] internal

4

means (e.g., reporting violations up a company's chain of command in an effort to effectuate institutional course correction).'"*Bourne v. Provider Servs. Holdings, LLC*, No. 1:12-cv-935, 2019 U.S. Dist. LEXIS 76959, at *10 (S.D.Ohio May 7, 2019) (citing *Jones-McNamara v. Holzer Health Sys.*, No. 2:13-cv-616, 2014 U.S. Dist. LEXIS 58674, *4 (S.D.Ohio Apr. 28, 2014).

To constitute protected activity, '"an employee need not complete an investigation into potential fraud or uncover an actual FCA violation' because the FCA's anti-retaliation provision protects employees while they are merely collecting information about potential fraud." *Miller,* 648 F.App'x 555, at 560 (citing *Jones-McNamara v. Holzer Health Sys.*, 630 F.App'x 394 (6th Cir.2015). Accordingly, consistent with other circuits, this circuit has explained that "although [the plaintiff] need not establish that [the employer] actually violated the FCA, [he] must show that [his] allegations of fraud grew out of a reasonable belief in such fraud." *Miller,* 648 F.App'x 555, at 560 (citing *Jones-McNamara,* 630 F.App'x 394, at 400); *see also Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 71, 380 U.S. App. D.C. 185 (D.C. Cir. 2008) (holding that employee must have subjective, good-faith belief and objectively reasonable belief that fraud is being committed against the government); *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (same); *Wilkins v. St. Louis Hous. Agency*, 314 F.3d 927, 933 (8th Cir.2002) (same); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir.2002) (same).

During the course of Plaintiff's employment, he became aware of "fraudulent activities perpetrated by Defendant against government healthcare programs, including Medicare and Medicaid" (Doc. 6 at ¶6). Specifically, Plaintiff witnessed Defendant "(1) charging for services purportedly rendered by a registered nurse that were not in fact rendered by a registered nurse, (2) employees impersonating a registered nurse, and (3) employees knowingly allowing other employees to use their name and credentials to document and write orders for patients." (Doc. 6 at

¶7).  Plaintiff reasonably believed that the actions he witnessed constituted Medicare and Medicaid fraud. Accordingly, Plaintiff repeatedly alerted his supervisors of the billing irregularities. (Doc.6 at ¶¶10-12, 17, 19, 22).   However, his warnings fell on deaf ears. (Doc. 6 at ¶13).

On or about March 8, 2024, Plaintiff sent an email to his supervisors discussing, among other things, the continued retaliation he was experiencing and the improper Medicare/Medicaid billing practices he had observed. (Doc. 6 at ¶17).  In this email, Plaintiff recounted the conversations he had with co-owner Becky Young, co-owner Tara Boggs, and Registered Nurse Laura Brown. During these conversations, Plaintiff's supervisors had acknowledged that the billing irregularities existed[1]. However, they refused to take sufficient actions to address them. "These actions qualify as protected activity, because these actions constitute 'internal' efforts to stop FCA-related misconduct." *Bourne v. Provider Servs. Holdings, LLC*, No. 1:12-cv-935, 2019 U.S. Dist. LEXIS 76959, * 10 (S.D.Ohio May 7, 2019); *See Jones-McNamara*, 2014 U.S. Dist. LEXIS 58674, 2014 WL 1671495, at *4; *see also United States ex rel. Elliott*, 2011 U.S. Dist. LEXIS 165842, 2014 WL 12787978, at *14 (finding protected activity where an employee informed his supervisors of allegedly "fraudulent billing practices"). "Making a report of potential Medicare fraud is not 'merely reporting wrongdoing to supervisors.'  It is an internal report that alleges fraud on the government. That is protected activity under the FCA." *Mikhaeil v. Walgreens Inc.*, E.D.Mich. No. 13-14107, 2015 U.S. Dist. LEXIS 21682, *22 (Feb. 24, 2015) (citing *McKenzie*, 219 F.3d at 516); *See United States ex rel. Marlar v. BWXT Y-12, L.L.C.,* 525 F.3d 439, 450 (6th Cir.2008) (holding that an employee adequately plead that she engaged in a protected activity where she "allege[d]

---

[1] The email reads: "We discussed how Sara cannot document under Tonya's name […] just to get her caught up with work. And how the billing was not submitted correctly. We discussed how things have been done in the past must be changed immediately. Although everyone agreed, not one manager spoke of a solution or plan to make the necessary changes needed. […] The fact that fraud has been committed (by staff members using the license of the RN by multiple other staff to document and write orders) did not phase management to take immediate action to include further investigation and discipline is evident they want to brush this under the rug."

that she observed purportedly fraudulent activity and confronted her employer about it").

Regardless, on March 9, 2024, Plaintiff sent another "detailed email to his supervisors, Ms. Boggs, Ms. Young, and Ms. Brown, outlining what he believed were the organization's criminal activities and expressing his concern regarding its continued inattention to these matters." (Doc. 6 at ¶19). Defendant seems to allege that Plaintiff's email does not contain the detail needed to make a report under the FCA. However, Plaintiff's email immediately draws attention to the criminal activity he has witnessed. His report names three individuals whom he believed were perpetrating the fraud, and specifically states that he is investigating the matter. "In the Sixth Circuit, an employee's investigation into fraud is protected if it reasonably embodies efforts to stop FCA violations. […] The FCA protects employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Allgood v. Baptist Mem. Med. Group Inc.*, No. 19-cv-2323, 2022 U.S. Dist. LEXIS 79024, *9-10 (W.D. Tenn. May 2, 2022) (Internal quotations omitted).

On March 9, 2024, Plaintiff also sent a text message to Ms. Boggs, Ms. Young, and Ms. Brown in which he stated that if the issues he raised were not resolved in a timely manner, he would pursue additional action though channels such as the Community Health Accreditation Program, Ohio Board of Nursing, and the Equal Employment Opportunity Commission. (Doc. 6 at ¶22). Thus, in summary, Plaintiff suspected billing fraud by Defendant in February of 2024. In March, he made a written report to his supervisors, engaged in multiple meetings to try to find a solution, and explained that he planned to report Defendant for this criminal activity. Plaintiff's actions reasonably embody efforts to stop fraud against the government. Making an internal report, investigating, and taking efforts to stop such fraud constitutes protected activity. As a result, Plaintiff has alleged facts sufficient to state the first element of his FCA-retaliation claim.

**2. Plaintiff has properly alleged that the Defendant was on Notice of his Protected Activity**

"In *Yuhasz*, the Sixth Circuit held that when a protected activity falls within an employee's normal 'employment obligations,' a heightened notice standard can apply." *Bourne v. Provider Servs. Holdings, LLC*, No. 1:12-cv-935, 2019 U.S. Dist. LEXIS 76959, *11 (S.D.Ohio May 7, 2019); *See Yuhasz*, 341 F.3d at 568 (holding that employees charged with investigating fraud "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations"). However, "a recent line of cases (including at least two from courts in the Sixth Circuit) has held that *Yuhasz*'s heightened notice standard did not survive the FCA's 2009 amendment." *Bourne*, 2019 U.S. Dist. LEXIS 76959, at *11); *Jones-McNamara*, 2014 U.S. Dist. LEXIS 58674, 2014 WL 1671495, at *4 (stating that "*Yuhasz*'s requirement that the employer knew that the employee was doing more than her job by bringing or furthering an FCA case" does "not remain correct"); *see also Mikhaeil v. Walgreens Inc.*, No. 2:13-CV-14107, 2015 U.S. Dist. LEXIS 21682, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015). The *Mikhaeil* court explains why:

> *Yuhasz* no longer appears to be correct in light of the [FCA's 2009] amendment […] [T]he FCA no longer requires that conduct be "in furtherance of an action under this section" to be protected. Rather, the FCA protects any "effort to stop 1 or more violations of this subsection." 31 U.S.C. 3730(h)(1) […] If an employee does not need to take steps clearly in furtherance of a potential or actual *qui tam* action to engage in protected activity, the employee, even if charged with investigating potential fraud, also does not need to "make clear their intentions of bringing or assisting in an FCA action," *Yuhasz*, 341 F.3d at 568, to satisfy the notice requirement […] By reporting [his/]her concerns directly to [his/her supervisor], [a] Plaintiff satisfie[s] the notice element of [his/]her […] case.

*Mikhaeil*, 2015 U.S. Dist. LEXIS 21682, 2015 WL 778179, at *9.

As a result, even assuming Plaintiff's job requirements were similar to those of the employee in *Yuhasz*, Defendant's argument that Plaintiff failed to provide the requisite notice because he did not state he was pursing an FCA action is incorrect. As stated previously, the FCA no longer

requires that conduct be "in furtherance of an action under this section" to be protected. Rather, the FCA protects any "effort to stop one or more violations of this subsection." 31 U.S.C. 3730(h)(1). "This includes internal reporting to supervisors 'whether or not such steps are clearly in furtherance of a potential or actual qui tam action.'" *Mikhaeil v. Walgreens Inc*., No. 13-14107, 2015 U.S. Dist. LEXIS 21682 (E.D.Mich Feb. 24, 2015) (citing 155 Cong Rec. E1295-03, at E1300); *Manfield v. Alutiiq Internatl. Solutions, Inc*., 851 F.Supp.2d 196 (D.Me.2012) ("Since a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity.").

In this case, Plaintiff repeatedly alerted his supervisors to the irregular and fraudulent billing practices. Absent *Yuhasz*'s heightened notice requirement, this act of reporting alone satisfies the second element of Plaintiff's FCA retaliation claim. But, even if *Yuhasz*'s heightened notice requirement survived the 2009 amendments, Plaintiff has alleged facts sufficient to prove that his employer knew about his protected activity. Plaintiff reported his concerns to management on numerous occasions. Reporting potential fraud to his employer, therefore, put Defendant on notice that he was engaging in protected activity. Once Plaintiff communicated that Defendant potentially engaged in fraud and threatened to report the criminal activity to outside agencies, Plaintiff experienced derogatory remarks, workstation reassignment, and termination. This conduct indicates that Plaintiff's employer was aware of (and opposed to) his protected activity. Thus, Plaintiff has alleged facts sufficient to state the second element of his FCA retaliation claim

### 3. Plaintiff was Terminated as a Result of his Protected Activity

The FCA's legislative history states that an employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.'" *McKenzie*, 219 F.3d

at 518 (citing S.Rep. No. 99-345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300). Plaintiff has made this showing.

On February 22, 2024, Plaintiff made his first verbal report to Ms. Young of his suspicions that Defendant was knowingly submitting false claims to the government for reimbursement for services not rendered by a registered nurse. (Doc. 6 at ¶10). On February 23, 2024, Plaintiff raised similar concerns to Ms. Boggs and had a formal meeting with Ms. Young, Ms. Boggs, and Ms. Brown on February 29, 2024. (Doc. 6 at ¶¶11-12). On March 8 and March 9, 2024, Plaintiff provided a written report of his concerns to his supervisors. (Doc. 6 at ¶¶17 & 19). On March 9, 2024, Plaintiff sent a text message in which he explained that he was going to pursue additional action through outside regulatory agencies. (Doc. 6 at ¶22). Defendant made the decision to terminate the Plaintiff less than one week later. (Doc. 6 at ¶23).

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) ("A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise.").

Defendant incorrectly states that linking an adverse employment action to protected activity is insufficient to establish causation. "[T]he causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity." *Judge v. Landscape Forms, Inc.*, 592 F.App'x 403 (6th Cir.2014). "In fact, this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely

near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir.2004); *See, e.g., Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116 (S.D. Ohio 1981) ("where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise"); *Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004) (The passage of less than three weeks between employer's receipt of notice of plaintiff's EEOC charge  and her termination gave rise to inference of discrimination).

Various sister circuits have also accepted this concept. *See, e.g.,Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986) ("[C]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge"); *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982) ("[C]ausal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[P]roof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment").

Furthermore, Plaintiff has alleged that his work was affected after he made his report. In addition to the harassment he experienced from his peers, Plaintiff's workstation was moved without his knowledge following a series of text messages where he asserted his legal rights to be free from retaliation and bullying. Coupled with temporal proximity, this evidence is sufficient to establish causation for Plaintiff's prima facie case. *See Hamilton v. Gen. Elec. Co*., 556 F.3d 428,

435-36 (6th Cir. 2009) ("The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his [protected activity] is sufficient to establish the causal nexus needed to establish a prima facie case.").

## B. Plaintiff has Sufficiently Alleged a Claim for Violation of Ohio's Whistleblower Statute

Ohio Rev. Code § 4113.52(A)(1)(f) applies when an employee, during the course of his employment, becomes aware of a legal violation that the "employer has authority to correct." *See* R.C. § 4113.52(A)(1)(f). The employee must have a reasonable belief that the violation is either a felony or "a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety." *Id.* If the employer does not correct or make a good faith effort to correct the violation within 24 hours, the employee may then notify outside authorities. *Id.*

Ohio's Whistleblower Protection Act ("OWPA") extends protection to a person who, during the course of his employment, becomes aware of a violation by a fellow employee. *See* R.C. § 4113.52(A)(3). The Supreme Court of Ohio has held that "to gain the protection of R.C. 4113.52(A)(3), an employee need not show that a co-worker had actually violated a statute, city ordinance, work rule, or company policy; it is sufficient that the employee had a reasonable belief that a violation occurred." *Fox v. City of Bowling Green*, 76 Ohio St.3d 534, 537, 668 N.E.2d 898 (1996); *See also Dargart v. Ohio DOT*, Ct. of Cl. No. 2002-09668, 2005-Ohio-1808 (an employee seeking protection under R.C. 4113.52 is not held to the standard of a lawyer as to whether an actual violation of law occurred; the employee must reasonably believe that the actions alleged could constitute a violation of the law).

To report a violation under R.C. § 4113.52, the employee is required to notify his supervisor or other responsible officer of the violation orally, and "subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation." *Id.*

Failure to strictly comply with these statutory requirements "prevents the employee from claiming the protections embodied in the statute." *Contreras v. Ferro Corp.*, 73 Ohio St.3d 244, 251, 652 N.E.2d 940 (1995).

The dictates of R.C. 4113.52 are not complete without a consideration of the effect of R.C. 4113.52(B). R.C. 4113.52(B) prohibits an employer for taking any "disciplinary or retaliatory action" against an employee for "making a report" or as a "result of the person's having made any inquiry or taken any other action to ensure the accuracy of any information reported." R.C. § 4113.52(B). "R.C. 4113.52(B) carries the statute's punch. That part of the statute sets forth what the employer may not retaliate against, and what actions bring about employer liability under the statute." *Fox v. City of Bowling Green*, 76 Ohio St.3d 534, 538, 668 N.E.2d 898 (1996).

As shown below, Plaintiff strictly complied with the statute. As a result, Defendant was prohibited from taking any retaliatory or disciplinary action against him.

**1. Plaintiff Made an Oral Report to his Supervisor in Accordance with R.C. § 4113.52**

Defendant appears to argue, with little merit, that Plaintiff's Amended Complaint fails to allege any misconduct within the scope of the OWPA. However, a simple and straightforward reading of the Complaint reveals the exact opposite. Plaintiff has clearly detailed instances of misconduct falling squarely within the purview of the OWPA. Defendant's selective interpretation of the Complaint suggests either a fundamental misunderstanding or a deliberate disregard of the well-pleaded facts, neither of which should distract from the merits of Plaintiff's claims.

Plaintiff explicitly stated in his Amended Complaint that he had a reasonable belief that he observed acts that were in "violation of 31 U.S.C.§ 3729(a)(1)(A), which prohibits knowingly presenting, or causing to be presented, false or fraudulent claims to the Federal Government for payment or approval." (Doc. 6 at ¶8). These acts included charging for services not rendered by a

registered nurse, employees impersonating a registered nurse, and allowing employees to use their name and credentials to document and write orders for patients. (Doc. 6 at ¶7). As a result of his concern, "Plaintiff orally notified his supervisors that he reasonably believed that *fraudulent activities* had been and were being committed on behalf of Defendant that were not only criminal in nature but were also an *imminent threat to patient safety*." (Doc. 6 at ¶37).

The Complaint specifically provides the dates on which Plaintiff made his oral complaints and the name of each supervisor to whom he reported them. (Doc. 6 at ¶¶10-12). On February 29, 2024, Plaintiff had an in-person meeting with his supervisors where he discussed his concerns once again. (Doc. 6 at ¶12). On March 8, 2024, Plaintiff sent an email to his supervisors that provided a clear summary of their discussion. (Doc. 6 at ¶17). A true and accurate copy of the email was attached and incorporated into the Amended Complaint as Exhibit B. This email clearly explained that Plaintiff raised concerns of employees improperly documenting under each other's names, and how billing was not being correctly submitted. Plaintiff provided the names of the employees and tried to encourage compliance.

As explicitly laid out in Plaintiff's Amended Complaint, he was undeniably concerned with activities that were not only criminal in nature but posed an imminent threat to patient safety— facts that are unequivocally alleged. Plaintiff further detailed that he reported these concerns *orally* to his supervisors, leaving no room for misinterpretation. Defendant's assertions that Plaintiff failed to allege violations under the OWPA, and failed to make oral complaints, is not only incorrect, but demonstrably false. Defendant's argument crumbles under the weight of Plaintiff's clear and specific allegations.

At this stage of the proceedings, the Court is required to construe the facts in the light most favorable to the non-moving party and accept the allegations in Plaintiff's Complaint as true. *Raver*

*v. Target Corp.*, No. 2:08-CV-1033, 2009 U.S. Dist. LEXIS 146570, at *3 (S.D.Ohio July 15, 2009) ("The Court must construe the complaint in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party.). In doing so, it becomes abundantly clear that Defendant's position is without merit.

## 2. Plaintiff Submitted a Written Report to his Supervisors Complying with R.C. § 4113.52

Plaintiff clearly alleged in the Complaint that he submitted a written report to his supervisors via email, a fact which must be accepted as true at this stage of the proceedings. (Doc. 6 at ¶19). This is not merely an assertion; it is easily verifiable by Defendant. Plaintiff attached the email to his Complaint as Exhibit C, and this same email was sent directly to Plaintiff's supervisors. Defendant has full access to its own email records and can effortlessly verify this fact by reviewing its email history. If Defendant somehow still disputes this, Plaintiff can produce additional text messages in which he confirms that a formal resolution attempt letter was indeed sent to the appropriate supervisory email addresses, further substantiating his claim. Any attempt by Defendant to claim otherwise is unavailing and disingenuous in light of the readily available evidence and the allegations in the Amended Complaint.

Contrary to Defendant's misguided assertions, Plaintiff's report contains more than enough detail to satisfy the requirements of the OWPA. Plaintiff's Amended Complaint outlines Plaintiff's specific concerns regarding ongoing criminal activity and imminent safety threats, all of which were conveyed in his report. Plaintiff's email specifically stated that formal discipline needed to occur for those involved in "defrauding the government by charging for services that [were] not rendered by an RN." (Doc. 6 at ¶20). It is readily apparent that the risks to safety are both significant and unmistakable. Further, "Plaintiff named three individuals who he believed were

15

actively engaging in fraudulent activities and encouraged additional investigation to ensure future compliance." (Doc. 6 at ¶21).

"The statute requires the filing of a written report following the oral notification to provide the supervisor or responsible person with a written account of the alleged violation so that it may be better identified and corrected." *Haney v. Chrysler Corp.*, 121 Ohio App.3d 137, 140, 699 N.E.2d 121 (6th Dist.1997). Plaintiff's report did just that. It provided his supervisors with a description of the illegal activities that were occurring and named three individuals who were actively responsible. There is no support "[i]n the statute's text or Ohio caselaw for a requirement that an employee specifically use the word 'felony' (or other such buzzword) in the written report." *McFarland v. Honeywell Internatl., Inc.*, No. 3:20-cv-85, 2020 U.S. Dist. LEXIS 144277, at *11-12 (S.D.Ohio Aug. 12, 2020). The level of detail provided was sufficient to inform Defendant of the nature and seriousness of the violations, giving it ample opportunity to address the concerns. *See Keefe v. Youngstown Diocese of the Catholic Church*, 121 Ohio App.3d 1, 7, 698 N.E.2d 1009 (5th Dist.1997) (it was an error to grant summary judgment when a letter sent by appellant's attorney contained sufficient detail to identify and describe the violations asserted by appellant despite not identifying specific instances when or why appellee failed to pay applicable social security withholdings). *See also Rheinecker v. Forest Laboratories*, 813 F.Supp. 1307 (S.D. Ohio 1993) (court denied employer's motion for summary judgment, holding that the question of whether a four-page facsimile sent by the employee to the employer satisfied R.C. 4113.52's notification was a material question of fact and not appropriate for summary judgment.).

Defendant's argument that Plaintiff's report lacks detail is not only unsupported by the facts but ignores the clear and specific allegations in the Amended Complaint. Plaintiff did not make vague or speculative claims — he provided factual descriptions of the unlawful conduct and the

individuals involved. These details are more than enough to meet the legal standard, and any claim to the contrary is an attempt to downplay the significance of Plaintiff's whistleblowing efforts.

### C. Plaintiff's Termination was in Violation of Public Policy

"Under Ohio law, at-will employees may be discharged by their employer for any reason, or no reason at all, provided that their termination is not contrary to public policy." *Hale v. Volunteers of Am.*, 158 Ohio App.3d 415, 2004-Ohio-4508, 816 N.E.2d 259, ¶ 31 (1st Dist.). "'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments" but may also be discerned as a matter of law based on other sources, "such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." *Painter v. Graley*, 70 Ohio St.3d 377, 384 (1994). To succeed on a claim for wrongful discharge in violation of public policy, a plaintiff-employee must establish the following:

> 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element);
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Hale*, 158 Ohio App.3d 415, at ¶ 31 (internal citations omitted)." The first two elements, the clarity element and the jeopardy element, pose questions of law to be determined by the court, while the third and fourth elements, the causation element and the overriding-business-justification element, pose questions of fact for the trier-of-fact." *Id.*

As discussed in detail above, the Plaintiff can adequately demonstrate a violation of the FCA and can maintain a substantive claim for protection under the OWPA. As a result, he is entitled

to bring a claim for discharge in violation of the public policy therein.

### 1. Plaintiff is able to Satisfy the Jeopardy Element

A plaintiff's satisfaction of the jeopardy element depends on: (1) "what kind of conduct is necessary to further the public policy at issue," (2) "whether the employee's actual conduct fell within the scope of conduct protected by [...]the policy," and (3) "whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal." *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 Fed. Appx. 256, 264 (6th Cir. 2008) (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)).

Defendant contends that Ohio's whistleblower statute provides the Plaintiff with adequate remedies and therefore, his public policy claim fails as a matter of law. However, this argument is fundamentally flawed. "The Supreme Court of Ohio has, at times, questioned whether any of the jeopardy element's three prongs can be satisfied where statutory remedies exist to protect public policy. The Supreme Court of Ohio has determined to focus its inquiry in this regard on 'the issue of adequacy of statutory remedies.'" *Wells v. Russ' Steamer Serv., LLC*, No. 3:23-cv-105, 2023 U.S. Dist. LEXIS 159949, at *10-11 (S.D. Ohio Sep. 8, 2023) (citing *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 244, 2002-Ohio-3994, 773 N.E.2d 526, 531 (Ohio 2002)). "It is clear that when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that policy." *Leininger v. Pioneer Natl. Latex*, 115 Ohio St. 3d 311, 316-317, 2007-Ohio-4921, 875 N.E.2d 36, 41-42 (Ohio 2007).

"Nonetheless, the existence of statutory remedies does not have a preclusive effect on the jeopardy element *per se.*" *Wells*, 2023 U.S. Dist. LEXIS 159949, at *10. The Supreme Court of Ohio has merely recognized that "[i]f the statute that establishes public policy contains its own

remedies, *it is less likely* that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy." *Wiles*, 773 N.E.2d at 531. (internal citation and quotation marks omitted) (emphasis added). "Such statutory remedies have been deemed adequate in cases citing public policy contained in the federal Family Medical Leave Act and Ohio's civil rights statutes. However, the Supreme Court of Ohio has not made a similar determination with respect to the State's whistleblower statute contained in Ohio Rev. Code § 4113.52." *Wells*, 2023 U.S. Dist. LEXIS 159949, at *11; *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 156, 1997 Ohio 219, 677 N.E.2d 308, 324 (Ohio 1997) ("Additionally, recognizing the right of an at-will employee who is discharged or disciplined in violation of R.C. 4113.52 to maintain a *Greeley* claim, a statutory whistleblower claim, or both, would foster (not hinder) the public policy of this state to protect whistleblowers from unlawful retaliatory measures. Therefore, the mere existence of statutory remedies in R.C. 4113.52 does not, without more, operate to bar recognition of appellant's *Greeley* claim for tortious wrongful discharge in violation of R.C. 4113.52."). Accordingly, "although Ohio Rev. Code § 4113.52 contains statutory remedies, the mere existence of those remedies is not enough to summarily defeat [Plaintiff's] public policy claim." *Wells*, 2023 U.S. Dist. LEXIS 159949, at *12.

Taking the allegations in the Complaint as true, Plaintiff put Defendant on notice of his concerns regarding potential fraud and patient safety. Such complaints are integral to ensuring patient wellbeing, and permitting Plaintiff's termination under the present circumstances jeopardizes Ohio's public policy favoring patient safety and the reporting of possible felonies. Therefore, Plaintiff's public policy claim satisfies the jeopardy element.

Additionally, the statutory remedy provided under the FCA's anti-retaliation provision is significant. However, additional protection via a public policy tort claim is necessary to fully

safeguard the public policy of encouraging whistleblowing. Without allowing a public policy claim, employees may be deterred from reporting fraud if they believe that FCA remedies are insufficient or procedurally complex to enforce. "The *Greeley* public-policy exception to the doctrine of employment at will was not intended to apply only where a statute provides no civil remedies. Rather, *Greeley* and its progeny are intended to bolster the public-policy of this state and to advance the rights of employees who are discharged or disciplined in contravention of clear public policy." *Kulch*, 78 Ohio St. 3d 134, at 156; Accord *Amos v. Oakdale Knitting Co.,* 331 N.C. 348, 356, 416 S.E.2d 166 (1992) (holding that a public policy exception to the employment-at-will doctrine adopted by the North Carolina Supreme Court in *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989), was "not just a remedial gap-filler. It is a judicially recognized outer limit to a judicially created doctrine, designed to vindicate the rights of employees fired for reasons offensive to the public policy of [North Carolina]. The existence of other remedies, therefore, does not render the public policy exception moot.").

Applying this reasoning to the FCA, the FCA's anti-retaliation provision reflects a strong federal public policy encouraging whistleblowing to prevent fraud against the government. While the FCA provides remedies for retaliation, these remedies may not fully vindicate the public policy of encouraging whistleblowers to report fraud. Thus, consistent with *Kulch*, the FCA forms an actionable basis for Plaintiff to bring a wrongful termination claim based on public policy, as allowing such a claim would ensure more complete protection of the critical public interest in deterring fraud.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is not well taken, and should be denied in its entirety.

Respectfully Submitted,

*/s/ Stephen E. Imm*
Stephen E. Imm (0040068)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, Ohio 45245
(513) 943-5678
(513) 943-6669-fax
stephen@finneylawfirm.com
*Attorney for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 7th day of October 2024, a copy of the foregoing was filed with the Court's CM/ECF system which will send notice of the same to all registered users of that system, including the following:

Rick L. Brunner (0012998)
Email: rlb@brunnerlaw.com
Patrick M. Quinn (0081692)
Email: pmq@brunnerlaw.com
Hannah Fard (0103586)
Email: hf@brunnerlaw.com
BRUNNER QUINN
5001 Horizons Drive, Suite 209
Columbus, Ohio 43220
Telephone: (614) 241-5550
Facsimile: (614) 241-5551
*Attorneys for Defendant Community*
*Home Health Care, Inc.*

*/s/ Stephen E. Imm*
Stephen E. Imm (0040068)