IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIAN BAIER,                              :
                                          :
        *Plaintiff,*                      :     Case No. 1:24-cv-00276
                                          :
v.                                        :     Judge Jeffery P. Hopkins
                                          :
COMMUNITY HOME HEALTH                     :
CARE, INC.,                               :
                                          :
        *Defendant.*                      :

## OPINION & ORDER

Knowledge is power. This rings especially true where, as here, a plaintiff predicates a four-count lawsuit on federal question jurisdiction arising from a single claim for retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3170, *et seq*. And so, because Plaintiff Brian Baier ("Plaintiff" or "Baier") fails to allege his former employer's *knowledge* of his protected activity, he does not have the *power* to maintain his lawsuit against Defendant Community Home Health Care, Inc. ("CHHC" or "Defendant") in federal court.

Comes now before the Court Defendant's Motion to Dismiss the Amended Complaint (the "Motion to Dismiss"). Doc. 8. For the reasons set forth below, the Court **GRANTS** Defendant's Motion to Dismiss. The claim for retaliation under the False Claims Act, 31 U.S.C. § 3730, *et seq*., (Count I) is **DISMISSED WITH PREJUDICE**. The Court declines to exercise supplemental jurisdiction and **DISMISSES** the remaining state law claims (Counts II, III, and IV) **WITHOUT PREJUDICE** to being filed in state court.

## I.    FACTUAL BACKGROUND

Brian Baier is a healthcare professional. He was employed by CHHC as a registered nurse from May 2023 until March 14, 2024. Am. Compl., Doc. 6, ¶ 5. During his employment, Baier allegedly uncovered "fraudulent activities perpetrated by Defendant against government healthcare programs, including Medicare and Medicaid." *Id.* ¶ 6. Specifically, Baier witnessed (1) Defendant "charging for services purportedly rendered by a registered nurse that were not in fact rendered by a registered nurse[;] (2) employees impersonating a registered nurse[;] and (3) employees knowingly allowing other employees to use their name and credentials to document and write orders for patients." *Id.* ¶ 7.

Baier was unsettled by these acts. He proceeded to report his suspicions of these activities internally to Defendant's management. *Id.* ¶ 9. On or about February 22, 2024, Plaintiff verbally informed CHHC co-owner Becky Young ("Young") about his concerns that certain staff members at CHHC were knowingly or improperly submitting false claims to the government for reimbursement for services not rendered by a registered nurse. *Id.* ¶ 10. One day later, Baier raised similar concerns with CHHC co-owner Tara Boggs ("Boggs"). *Id.* ¶ 11. Approximately one week after that, on February 29, 2024, Baier met with Young, Boggs, and registered nurse Laura Brown ("Brown") and again raised concerns about the allegedly fraudulent activities he had observed. *Id.* ¶ 12.

Baier contends that, rather than substantively addressing the issues he raised, CHHC and other company officials launched a campaign of retaliation against him. *Id.* ¶ 13. Plaintiff claims this campaign of retaliation entailed CHHC permitting and promoting its staff to make derogatory remarks about him. *Id.* ¶ 14. On or around March 1, 2024, Plaintiff sent text messages to Boggs and Brown requesting that they "cease and desist speaking further about

[Plaintiff] negatively" (the "March 1 Texts"). Pl. Ex. A, Doc. 6-1, PageID 40. In those same messages, Plaintiff maintained that he was "protected from retaliation and under the whistle blower act! [*sic*]" *Id.* Plaintiff also avers he suffered another retaliatory act approximately one week later when he "reported to work to find that his workstation had been moved without his knowledge or consent." Am. Compl., ¶ 16.

Following his workplace relocation, Baier purportedly wrote an email letter to Boggs, Young, and Brown on March 8, 2024 recounting the events of the previous three weeks and discussing the "continued retaliation he was experiencing" (the "March 8 Letter"). *Id.* ¶ 17; Pl. Ex. B, Doc. 6-2. Baier expressed further concerns regarding:

> [T]he lack of structure in the department, staff performance evaluations, chart audits in preparation for [accreditation programs], ethical/moral concerns of non-[registered nurse] staff using the [registered nurse] login to document and wright [*sic*] orders in her name, doing what is best for the business, the need to restructure and develop a solid foundation … billing on patients before the necessary information/documentation was completed … [workplace] intimidat[ion] [and] gossiping … [and his supervisors' failure to] resolv[e] any of these issues.

*Id.* at PageID 43. In this letter, Plaintiff also memorialized his February 22, 2024 meeting with Young, his February 23, 2024 meeting with Boggs, and his February 29, 2024 meeting with Young, Boggs, and Brown. *Id.* The letter retraced Baier's communication of issues regarding billing "not being submitted correctly" and "staff members using the license of the RN [registered nurse] by multiple the staff to document and write orders." *Id.* at PageID 44.

Baier then described the retaliation he had subsequently endured. Plaintiff complained that "the demeanor of the [work]staff ha[d] changed" since his reports and alleged that Young and Boggs "would go off to the side … [e]xaggerating their conversation to be loud with excessive laughter in an obvious attempt to show their unity to one another." *Id.* Baier further documented three supervisory criticisms he received from Sara Friddle ("Friddle")—one

concerning an illegible entry on a time sheet, the other on deleting duplicate medications, and the final on the "HHA" hours indicated on a client's record—that he felt "were intended to show authority over [him] and harass [him] because [he] spoke of … misconduct." *Id*. at PageID 44–45.

On or about March 9, 2024, Plaintiff purportedly wrote another email letter to CHHC's owners Boggs and Young and registered nurse Brown reiterating the same issues he had previously reported (the "March 9 Letter"). Pl. Ex. C, Doc. 6-3, PageID 46. Those issues concerned "false documentation, defrauding the government by charging for services that was [*sic*] not rendered by a [registered nurse ("RN")], Impersonating [*sic*] an RN, [and] knowingly allowing someone else to use one's name and credentials to document and write orders for patients." *Id*. Baier identified three individuals through his "limited investigation" and requested "[f]ormal discipline to those involved in criminal activity." *Id*. Baier also demanded greater "[c]omputer security," "[b]illing … compliance," an assurance that "staff are free from intimidation and retaliation," and the establishment of a "multidisciplinary team of staff to ensure we remain compliant." *Id*.

On the same day, Baier sent a text message to Boggs, Young, and Brown in which he stated that if the issues he identified in his March 8 Letter were not resolved in a timely manner, he would pursue additional action though the Community Health Accreditation Program, Ohio Board of Nursing, and the Equal Employment Opportunity Commission (the "March 9 Texts"). Am. Compl., ¶ 22; Pl. Ex. D, Doc. 6-4, PageID 47. The following week, on March 14, 2024, Baier was terminated from CHHC. Am. Compl., ¶ 23.

Two months later, Plaintiff brought the instant action. *See* Doc. 1. The Amended Complaint alleges four causes of action: Count I, for termination in violation of the anti-

4

retaliation provision of the False Claims Act, 31 U.S.C. § 3170, *et seq.*; Count II, a claim under Ohio common law for wrongful termination in violation of the public policy espoused by the anti-retaliation provision of the FCA; Count III, for termination in violation of Ohio's statutory whistleblower protection provisions, Ohio Rev. Code § 4113.52; and Count IV, for wrongful termination in violation of the public policy espoused by Ohio Rev. Code § 4113.52. *See* Am. Compl. Defendant filed the instant Motion to Dismiss on September 16, 2024. Doc. 8. The Motion is fully briefed and ripe for adjudication.

## II.   LEGAL STANDARD

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But in doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

### III. LAW AND ANALYSIS

This case is in federal court because it is predicated on federal question jurisdiction. Plaintiff's first and only federal claim arises under the False Claims Act, 31 U.S.C. § 3730(h), *et seq*. Am. Compl., ¶ 3. Under Count I, Plaintiff adequately alleges that he was engaged in protected activity. Nevertheless, Count I fails because Plaintiff has not plausibly alleged the second element of an FCA retaliation claim: that his employer knew or had reason to suspect that he engaged in the protected activity. *United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 880 (6th Cir. 2021) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)). The dismissal of Plaintiff's federal claim subsequently deprives this Court of original jurisdiction. Because the case is in its early stages, the Court declines to exercise supplemental jurisdiction over the remaining state law claims (Counts II, III, and IV).

### A. Count I: Retaliation under False Claims Act, 31 U.S.C. § 3730, *et seq.*

#### i.   *Law*

The FCA's retaliation provision protects employees, contractors, or agents from being discharged or discriminated against because of lawful acts done either in furtherance of an action under the FCA or in effort to stop FCA violations. *See* 31 U.S.C. § 3730(h). As with other employment-related retaliation claims, retaliatory discharge claims under § 3730(h) proceed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 396–97 (6th Cir. 2015). Where, as here, a plaintiff aims to establish a retaliation claim by presenting circumstantial evidence, the plaintiff bears the initial burden to demonstrate a prima-facie case of retaliation. *Jones-McNamara*, 630 F. App'x at 397–98. Once a plaintiff makes the prima facie showing, the burden then shifts to the defendant to produce a "legitimate,

6

nondiscriminatory reason for the adverse employment action." *Id.* at 398. If the defendant meets that burden, the plaintiff ultimately must show that the proffered reason is pretextual. *Id.*

To make a prima-facie case of retaliation, a plaintiff must demonstrate that: "(1) [he] was engaged in a protected activity; (2) [his] employer knew that [he] engaged in the protected activity; and (3) [his] employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* (citing *Yuhasz*, 341 F.3d at 566).

The first and second element have a somewhat convoluted history in the Sixth Circuit after the 2009 amendment to the FCA, particularly where a plaintiff's alleged protected activity consists of internal efforts to stop fraud against the government. Prior to the 2009 amendment, a plaintiff seeking redress for retaliatory discharge under the FCA had "'the burden of pleading facts which would demonstrate that defendants had been put on notice that [the] plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'" *Yuhasz*, 341 F.3d at 567 (quoting *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)). However, § 3730(h) was amended in 2009 to expand protections beyond activities undertaken in furtherance of a *qui tam* action. The amended language explicitly protects "other efforts to stop" violations of the FCA. 31 U.S.C. § 3730(h). In light of this change, the Sixth Circuit held in *Miller v. Abbott Lab'ys* that "pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual *qui tam* action is no longer applicable." 648 F. App'x 555, 560 (6th Cir. 2016).

Courts in the Sixth Circuit have since held that the notice standard articulated in *Yuhasz*, which required plaintiffs to show that their employers "had been put on notice that

plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government employees," was abrogated by the 2009 amendment. *See Cephas-Hill v. Linden Med. Ctr./Mid-Ohio Fam. Prac. Assocs.*, No. 2:20-cv-4281, 2022 WL 5177771, at *3–4 (S.D. Ohio Aug. 2, 2022) (collecting cases). In other words, after the 2009 amendment, courts assumed that the notice element no longer required plaintiffs to show that they had made clear to their employer that they intended to bring or assist in an FCA action. *See Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179, at *9 (E.D. Mich. Feb. 24, 2015) ("If an employee does not need to take steps clearly in furtherance of a potential or actual *qui tam* action to engage in protected activity, the employee, even if charged with investigating potential fraud, also does not need to 'make clear their intentions of bringing or assisting in an FCA action' . . . to satisfy the notice requirement.") (quoting *Yuhasz*, 341 F.3d at 568). Indeed, the Sixth Circuit's decision in *Miller* seems to confirm this interpretation, though *Miller* only addressed the first element of an FCA retaliation claim because the plaintiff there had failed to demonstrate that she engaged in a protected activity. *Miller*, 648 F. App'x at 563; *see also Cephas-Hill*, 2022 WL 5177771 at *4 ("[B]uilding on *Miller*, if the first prong views actions other than a *qui tam* action as 'protected activity,' then the second prong should also allow for notice of non-*qui-tam*-action activities.").

However, the Sixth Circuit's decision in *United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876 (6th Cir. 2021) appears to mandate that district courts apply a pre-amendment notice standard. *See Cephas-Hill*, 2022 WL 5177771, at *4 (discussing *Wal-Mart*). In *Wal-Mart*, Sixth Circuit affirmed the dismissal of an FCA retaliation claim brought by a plaintiff who made internal reports of suspected fraud. *Wal-Mart*, 858 F. App'x at 880. The court reasoned that this internal reporting was insufficient to satisfy the notice requirement, because

"[e]mployees must make clear their intentions of *bringing or assisting in an FCA action* to show retaliation." *Id.* (cleaned up) (emphasis added). The court specifically emphasized that even when "an employee tells their employer that they have witnessed illegal conduct and that other companies have incurred FCA liability for similar conduct, that fails to establish that an employee is pursuing an FCA action." *Id.* (citing *Yuhasz*, 341 F.3d at 567).

Importantly, even under the pre-amendment statutory scheme, the Sixth Circuit did not require that an employee explicitly inform their employer that they were cooperating with the government or planning to file a *qui tam* action. *See, e.g.*, *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449–50 (6th Cir. 2008). *In Marlar,* the court clarified that "a plaintiff must only allege activities 'that would have given [the defendant] reason to believe that she was contemplating a *qui tam* action.'" *Id.* (quoting *United States ex rel. McKenzie v. BellSouth Telecomms., Inc. (McKenzie I),* 123 F.3d 935, 944 (6th Cir. 1997)). This test would include employees making internal complaints if the complaints "characterize the plaintiff's concerns as involving illegal, unlawful or false-claims against the government." *Id.* (cleaned up).

ii.   *Analysis*

In order to show that he engaged in protected activity, Plaintiff "must allege that he engaged in activities that either: (1) were in furtherance of a *qui tam* action under § 3730 of the FCA; or (2) were in effort to stop one or more violations of the FCA." *Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015), *aff'd*, 676 F. App'x 421 (6th Cir. 2017) (citing 31 U.S.C. § 3730(h)). The "protected activity should be interpreted broadly." *McKenzie v. BellSouth Telecommunications, Inc. (McKenzie II)*, 219 F.3d 508, 515 (6th Cir. 2000) (quoting *McKenzie I*, 123 F.3d at 944). For the first prong, the protected activity "must relate to 'exposing fraud' or 'involvement with a false claims disclosure.'" *Mehlman v.*

9

*Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 WL 3560571, at *5 (S.D. Ohio Aug. 11, 2021) (quoting *McKenzie II*, 219 F.3d at 516 (citation omitted)). Plaintiff "need not establish that [CHHC] actually violated the FCA," so long as he "show[s] that [his] allegations of fraud grew out of a reasonable belief in such fraud." *Jones-McNamara v. Holzer Health Systems*, 630 F. App'x. 394, 400 (6th Cir. 2015).

"On a motion to dismiss, we credit, as we must, [Baier's] representations" that he reasonably believed fraudulent activity against the government was afoot. *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 461 (6th Cir. 2018). Although the March 1 Texts and the March 8 Letter do not concern fraud against the government, the March 9 Letter purportedly does. In that email letter, Baier identified three individuals whom he reported were allegedly involved in fraudulent activity and encouraged additional steps to ensure future compliance. *See* Pl. Ex. C; Am. Compl., ¶ 21. The fraudulent activity included "false documentation, defrauding the government by charging for services that was [*sic*] not rendered by a RN, Impersonating [*sic*] an RN, [and] knowingly allowing someone else to use one's name and credentials to document and write orders for patients."[1] Pl. Ex. C, PageID 46.

Not all of these allegations are within the ambit of the FCA, however. Though "internal reporting may constitute protected activity, the internal reports must allege fraud *on the government*." *McKenzie II*, 219 F.3d at 516 (emphasis added). Thus, Plaintiff's reports of "false documentation," "[i]mpersonating an RN," and "knowingly allowing someone else to

---

[1] Although Baier's allegations of fraud at CHHC "are not specific enough to constitute an FCA fraud claim, in that they do not meet the heightened specificity standards of Rule 9(b), they permit the continuation of a FCA retaliation claim, which need only meet the more lenient plausibility standards of Rule 8(a)." *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 460 (6th Cir. 2018) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102–3 (9th Cir. 2008).

use one's name and credentials to document and write orders for patients," (Doc. 6-3, PageID 46), do not constitute protected activity "because none of these violations allege fraud *on the government*." *Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179, at *8 (E.D. Mich. Feb. 24, 2015) (citing *McKenzie II*, 219 F.3d at 516–17). Rather, these complaints are of Plaintiff "merely grumbling to the employer about … regulatory violations," which, though may give cause for concern, do "not satisfy the [protected activity] requirement." *Id.* at 518 (internal citation omitted).

That leaves Plaintiff's statement that he "investigat[ed]" individuals "defrauding the government by charging for services that [were] not rendered by a RN." Pl. Ex. C, PageID 46. Accepting all factual allegations as true and drawing all reasonable inferences in favor of Plaintiff, the Court finds that this action qualifies as protected activity. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The letter reflects Plaintiff's "pursui[t] [of] an effort to stop a *specific* violation (or potential violation) of the FCA of which he … [was] aware." *Kem v. Bering Straits Info. Tech.*, No. 2:14-cv-263, 2014 WL 5448402, at *3 (S.D. Ohio Oct. 22, 2014). This activity "relate[s] to exposing fraud or [an] involvement with a false claims disclosure." *Mehlman*, 2021 WL 3560571, at *5 (cleaned up). Additional information would likely be required to *prevail* on this claim, but as to the first element, the "standards for establishing protected activity" remain "lenient" at the motion to dismiss stage and are subject to a relaxed "reasonable belief requirement." *Jones-McNamara*, 630 F. App'x at 399; *see also Crocket*, 721 F. App'x at 460 (noting the "lower standard required to survive a motion to dismiss on a FCA retaliation claim").

Baier's Amended Complaint meets this relaxed standard. He alleges that he conducted a "limited investigation" and "identified" certain individuals whom he claims "defraud[ed]

11

the government by charging for services that [were] not rendered by an RN." Doc. 6-3, PageID 46; Am. Compl., ¶ 21. This inference is further "strengthened by the fact that the government will only pay for services that are medically appropriate for each Medicare patient." *Crockett*, 721 F. App'x at 461 (citing 42 C.F.R. §§ 413.335, 413.335, 413.337, 483.20). Baier "therefore connected" his investigation of CHHC's actions, namely improper Medicare/Medicaid charging, "to a concern about fraud on the federal government." *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 (6th Cir. 2008). And although Plaintiff concedes that his investigation was "limited," he nevertheless may have engaged in protected activity even "before [he] [had] put all the pieces of the fraud together" and "even if the target of an investigation or action to be filed was innocent." *Jones-McNamara*, 630 F. App'x at 399 (cleaned up).

Thus, Plaintiff has adequately pleaded the first element of a claim for retaliation under the FCA: that he was engaged in protected activity. The allegations are sufficient at this stage to satisfy the requirement that a "an employee's belief in the presence of FCA violations be a reasonable one." *Crockett*, 721 F. App'x 461.

Nonetheless, and critically, Plaintiff has not established the second element of an FCA retaliation claim: Defendant's knowledge or reason to suspect that he was engaged in the protected activity. Put differently, Baier's retaliation claim "fails because he failed to plead that [CHHC] knew he was pursuing an FCA action." *United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 880 (6th Cir. 2021). Employees "'must make clear their intentions of bringing or assisting in an FCA action' to show retaliation." *Id*. (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)). The notice to CHHC "need not [have] explicitly characterize[d] [Baier's] concerns as involving false claims against the government,

12

but 'there must be some reason for [CHHC] to suspect that [Baier] was contemplating a *qui tam* action or was assisting the government in an FCA investigation.'" *Mehlman*, 2021 WL 3560571, at *5 (quoting *Kachaylo v. Brookfield Tp. Bd. of Trs.*, 778 F.Supp.2d 814, 820–821 (N.D. Ohio 2011)).

This is what dooms Baier's claim for retaliation. Nowhere in his briefing does Plaintiff "suggest that [he] was contemplating [bringing] a *qui tam* action or that [he] was assisting the government in its case." *Cephas-Hill v. Linden Med. Ctr./Mid-Ohio Fam. Prac. Assocs.*, No. 2:20-cv-4281, 2022 WL 5177771, at *5 (S.D. Ohio Aug. 2, 2022). The most that Plaintiff alleges is that he "communicated that Defendant potentially engaged in fraud and threatened to report the criminal activity to outside agencies." Doc. 9, PageID 78; Am. Compl., ¶ 22.

But still, this does not satisfy the notice requirement. Plaintiff has not adequately nor plausibly alleged that he communicated his reasonable belief in fraud to CHHC in order for Defendant to have known or have had reason to suspect that he intended "[to] bring[] or assist[] in an FCA action." *Wal-Mart*, 858 F. App'x at 880 (quoting *Yuhasz*, 341 F.3d at 568). Even though Plaintiff alleged that he "witnessed illegal conduct …, [this] fails to establish that [he was or intended on] pursuing an FCA action." *Wal-Mart*, 858 F. App'x at 880 (citing *Yuhasz*, 341 F.3d at 567). There must be some overt communication to CHHC or some legitimate reason for CHHC to suspect that Baier was contemplating bringing an FCA action or assisting the government in an investigation. *Wal-Mart*, 858 F. App'x at 880 ("Employees must make clear their intentions of bringing or assisting in an FCA action to show retaliation.") (cleaned up).

The support for Plaintiff's claim that he apprised Defendant of his protected activity is impermissibly tenuous. Plaintiff relies on Exhibit D to establish Defendant's notice (the

13

"March 9 Texts"). Am. Compl., ¶ 22. Exhibit D purports to be a "true and accurate copy of the text message" Plaintiff sent to Boggs, Young, and Brown on March 9. *Id.*; Pl. Ex. D, Doc. 6-4, PageID 47. In this text message, Plaintiff allegedly conveyed that he would pursue additional action through "channels such as the Community Health Accreditation Program, Ohio Board of Nursing, and the Equal Employment Opportunity Commission" if the concerns outlined in the March 8 Letter remained unresolved. Am. Compl., ¶ 22. Plaintiff did not specify any of those concerns in the March 9 Texts—only that he urged the recipients "to either correct or make plans to correct the issue identified." Pl. Ex. D, PageID 47.

This factual "support" does not establish Defendant's notice. Nor does it give reasonable inference for it. To begin, the March 9 Texts appear to be a screenshot of a note addressed to *himself* that Plaintiff privately wrote on the "Notes" app of his personal Android phone. Pl. Ex. D, PageID 47. Unlike Exhibit A, which reflects text message bubbles and which details the date and time of the exchange of the messages and the contact information for "CHHC_Laura Brown, RN" and "Tara Boggs," (Pl. Ex. A, Doc. 6-1, PageID 40–42), Exhibit D is a note-to-self addressed only to "[Plaintiff]." Pl. Ex. D, PageID 47. Exhibit D states that "[Plaintiff] [is] sending this text to Laura [Brown], Tara [Boggs] and Becky [Young]," but there is neither any corresponding contact information for those three individuals nor any such text bubble. *Id.* In short, Exhibit D—on which Plaintiff predicates Defendant's notice—appears to have been an e-note written to himself and on his own private phone that Plaintiff never actually communicated to Defendant. The Court would be inclined to infer that Plaintiff sent this message to his supervisors, but because Exhibit D does not reflect an actual text message exchange (unlike Exhibit A), and because Plaintiff could have

simply attached the actual text message exchange (as he did with Exhibit A) but did not, the Court finds such a factual inference to be unwarranted.

That aside, even if the Court was to infer that the March 9 Texts were indeed communicated to Plaintiff's supervisors, the Court still finds that Plaintiff had not "ma[d]e clear [his] intentions of bringing or assisting in an FCA action to show retaliation." *Cephas-Hill*, 2022 WL 5177771, at *4 (citing *Wal-Mart*, 858 F. App'x at 880). Because Plaintiff incorporates by reference the March 8 Letter in the March 9 Texts, the Court begins this analysis by reading the two in conjunction with each other. At first glance, it may appear that Plaintiff's statement that he would "move to the next step….[*sic*] CHAPS, Ohio Board of Nursing and EEO" if the "issue identified" in the March 8 Letter was not "correct[ed]" gave Defendant reason to suspect Plaintiff's intent of bringing a *qui tam* action or of assisting the government in an FCA investigation. Pl. Ex. D., PageID 47.

But not so. The March 8 Letter is a meandering narrative and laundry list of ordinary workplaces grievances that never once touches on unlawful, illegal, or fraudulent acts— against the *government*. *See* Pl. Ex. C, Doc. 6-2, PageID 43–46. The March 8 Letter discusses issues such as a "lack of structure in the department, staff performance evaluations, chart audits in preparation for CHAPS, *ethical/moral* [*i.e.*, not legal] concerns of non-RN staff using the RN login to document and wright [*sic*] orders in her name, doing what is best for the business, [and] the need to restructure and develop a solid foundation." *Id*. at PageID 43 (emphasis added). Plaintiff raised additional issues concerning workplace "intimidat[ion]" and "bullying," where he alleged that because certain individuals "exaggerate[ed] their conversation to be loud with excessive laughter in an obvious attempt to show their unity to one another … it [became] clear [that] [Plaintiff] was on their list to bully." *Id*. at PageID 44.

15

And Plaintiff bemoaned his supervisor's alleged "insensitiv[ity]" by asking when Plaintiff could return to work after being informed that his son "tested positive for COVID." *Id*. at PageID 45. However "toxic" Defendant's workplace may have been, anti-retaliation statutes "are not intended to protect against 'trivial harms' and are not intended to impose 'a general civility code for the American workplace.'" *U.S. ex rel. Howard v. Lockheed Martin Corp*., 14 F. Supp. 3d 982, 1021 (S.D. Ohio 2014) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Thus, the issues addressed in the March 8 Letter are more appropriately viewed as traditional workplace grievances that do not establish Defendant's knowledge or give Defendant reason to suspect that Plaintiff was engaged in protected activity concerning alleged fraud against the government.

But what about Plaintiff's averments that he met with certain CHHC personnel on February 22, 23 and 29 and verbally informed them about the "fraudulent activities" he witnessed, including that certain individuals were "knowingly submitting false claims to the government for reimbursement[?]" Am. Compl., ¶¶ 10–12. Again, these allegations are undercut by Plaintiff's own recollection of those meetings in the March 8 Letter. In that letter, Plaintiff characterized the February 22, 2024 meeting with Young as a "discuss[ion] [of] issues with the department and pros and cons of Maggie as the administrator as well as the role the Administrator should have." Pl. Ex. B, PageID 43. Plaintiff recalled feeling indignation when he had previously "observed texting" among certain individuals who were "gossiping between them concerning [another coworker]." *Id*. But there is no mention of "fraudulent activities" or "government." Further, Plaintiff characterized the February 23, 2024 meeting with Boggs as "basically the same discussion." *Id*. Yet again is there not a single mention of "fraudulent activities" or "government." Further still, Plaintiff characterized the

16

February 29, 2024 meeting with Brown, Boggs, and Young as a "meeting … to discuss … miscommunication [and] [p]ersonal issues." *Id.* at PageID 44. Admittedly, Plaintiff did note a small concern regarding billing "not being submitted correctly" and "fraud [being] committed [] by staff members using the license of the RN by multiple other staff to document and write orders." *Id.* But as discussed above, the flagging of this issue does not constitute protected activity "because none of these violations allege fraud *on the government*." *Mikhaeil*, 2015 WL 778179, at *8 (emphasis added).

That leaves the March 9 Letter for purposes of establishing Defendant's notice of Plaintiff's protected activity. As a preliminary matter, the Court notes that the March 9 Letter suffers from many of the same deficiencies as the March 9 Texts (and the March 8 Letter). The March 9 Letter is not addressed to any of Plaintiff's supervisors but merely to the unidentified "whom it may concern[.]" Pl. Ex. C, PageID 46. Although Plaintiff liberally describes it as a "detailed email," (Am. Compl., ¶ 19), the March 9 Letter is not an email in the conventional sense. Exhibit C does not contain any sent/received receipts, email addresses, dates, email signatures, or any other commonly used email features or characteristics. Rather, it appears to be an ordinary, unpublished Microsoft Word document that anyone can draft up on a personal computer with access to that software. Pl. Ex. C, PageID 46. Although Plaintiff alleges he sent the March 9 Letter directly "to his supervisors, Ms. [Tara] Boggs, Ms. [Becky] Young, and Ms. [Laura] Brown," (Am. Compl., ¶ 19), the letter puzzlingly refers to Brown and Boggs in the third person. *See* Pl. Ex. C, PageID 46. And the letter even has to explain that "Laura" is the "[a]dministrator" and that "Tara" is the "co-owner [of CHHC]." *Id.* Regardless, the Court will still "accept" the allegation that Plaintiff

17

sent this letter to his supervisors "as true ... and draw all reasonable inferences in [his] favor." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Even so, the Court finds that the March 9 Letter does not adequately impute to Defendant knowledge of or reason to suspect Plaintiff's engagement in protected activity. Recall the commanding inquiry: "'there must be *some* reason for the employer to suspect that the plaintiff was contemplating a *qui tam* action or was assisting the government in an FCA investigation.'" *Mehlman*, 2021 WL 3560571, at *5 (quoting *Kachaylo v. Brookfield Twp. Bd. of Trs.*, 778 F. Supp. 2d 814, 820 (N.D. Ohio 2011)) (emphasis added). Here, the notice as alleged in the Amended Complaint "fails to connect Plaintiff's activity to an FCA claim or investigation." *Id.* Plaintiff has not asserted "facts under which Defendant[] would have had any indication that Plaintiff may have ultimately initiated an FCA action or reported Defendant['s] activities to the federal government." *Id.* True, the March 9 Letter makes a glancing reference to the supposed "criminal activity" of certain individuals involved in allegedly "defrauding the government by charging for services that [were] not rendered by an RN." Pl. Ex. C, PageID 46. But that is the *total* extent of the criminal activity alleged.[2] There are no dates associated with when the alleged fraud occurred or the amounts fraudulently billed. There is no indication that this was a sustained and pervasive pattern of fraudulent

---

[2] Technically, Plaintiff "classified" every single issue he raised in the March 9 Letter "as criminal in nature." Pl. Ex. C, PageID 46. This would mean that Plaintiff's "work area [being] moved without [his] knowledge" and subsequently being "placed on the desk without connecting/setting up [his] computer" is "criminal in nature." *Id.* This would further mean that certain individuals providing other coworkers "access to ... login information to document on patients under their name and credentials" is "criminal in nature." *Id.* This would also mean that CHHC failing to revise "computer security ... to limit staff access" is "criminal in nature." *Id.* In other words, by Plaintiff characterizing *every* single issue he raised in the March 9 Letter—ranging from coworker drama to regulatory violations—as "criminal in nature," this undercuts the sincerity of his allegation of fraudulent activity and militates against a finding that CHHC had a legitimate "reason to suspect" that Plaintiff intended to initiate an FCA action or cooperate with a government investigation. *Mehlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 WL 3560571, at *5 (S.D. Ohio Aug. 11, 2021) (internal quotations and citations omitted).

18

billing or a few isolated occurrences. There is no description of what Plaintiff's "limited investigation" entailed. *Id.* And although Plaintiff identifies three individuals, it is unclear if he accused those individuals of "defrauding the government" (which would constitute protected activity) or of providing "false documentation, … [i]mpersonating an RN, [or] knowingly allowing someone else to use [their] name and credentials to document and write orders for patients" (which does not constitute protected activity). *Id.*

In fact, there is more information in the March 9 Letter about Plaintiff's suspicion that his "work area [being] moved without [his] knowledge … [was] a show of force" designed "to intimidate [him] to remain silent" than there is discussion on the nature of the alleged criminal activity. *Id.* This transitory reference to criminality cannot plausibly be read to suggest an intent on the part of Plaintiff to launch a *qui tam* action or to assist the government in an FCA investigation. And the most that the March 9 Letter demands by way of remedy is "formal discipline to those involved in criminal activity," "training," and the establishment of a "multidisciplinary team of staff to ensure [CHHC] remain[s] compliant." *Id.* This does not plausibly give Defendant "reason to suspect" that Plaintiff intended to initiate an FCA action or cooperate with a government investigation. *Mehlman*, 2021 WL 3560571, at *5 (internal quotations and citations omitted).

At bottom, the only conceivable notice of protected activity that Plaintiff appeared to communicate to Defendant was through a brief reference to "defrauding the government" in one letter (which may not have even been sent to Plaintiff's supervisors) that almost exclusively focused on ordinary workplace grievances. This is not enough to show that Defendant knew or had reason to suspect that Plaintiff was "engaged in the protected activity." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015); *see, e.g.,*

*United States ex rel. Murphy v. TriHealth, Inc.*, No. 1:19-cv-168, 2025 WL 2104279, at *15 (S.D. Ohio July 28, 2025) (finding notice adequately pleaded where a plaintiff "persisted in objecting to and attempting to stop the allegedly illegal compensation structures" after having received a warning from the defendant's CEO); *United States v. Empowering Integrated Care Sols., LLC*, No. 1:22-cv-480, 2025 WL 843638, at *7 (N.D. Ohio Mar. 18, 2025) (inferring notice where the defendant met with a consultant following the plaintiff's "email/letter [that] put [the] [d]efendant on notice that [the] [p]laintiff was engaging in protected activity by reporting suspected FCA violations"); *United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. 1:21-cv-84, 2024 WL 221758, at *12 (E.D. Tenn. Jan. 19, 2024) (inferring notice where the plaintiffs "repeatedly raised concerns" of non-compliance over the course of three years through direct complaints, conversations with leadership, and a filing of an e-report); *Lockhart v. Gainwell Techs. LLC*, No. 2:23-cv-12335, 2024 WL 3909558, at *5 (E.D. Mich. Aug. 22, 2024) (inferring notice where the plaintiff "detailed numerous instances in which she not only identified but also vocally opposed fraudulent practices … [and] articulated objections and compliance concerns through various communications … meetings and direct emails to high-ranking executives"); *McFeeters v. Nw. Hosp., LLC*, No. 3-13-0467, 2015 WL 328212, at *6 (M.D. Tenn. Jan. 23, 2015) (inferring notice where the plaintiff "allege[d] that she not only reported [the] [d]efendants' practices to Medicare, but she also notified the hospital CEO, [a]ssistant CEO, and two of her supervisors in writing that she had reported their misconduct to Medicare").

Thus, because Plaintiff has not adequately pleaded facts to support that Defendant knew or had reason to suspect that he was engaged in protected activity, Plaintiff's claim for retaliation under the FCA fails. On the record presented, the Court does not reach a

conclusion as to the third element of a claim for retaliation under the FCA: whether Plaintiff was "discharged or otherwise discriminated against … as a result of the protected activity." *Jones-McNamara*, 630 F. App'x at 398 (citing *Yuhasz*, 341 F.3d at 566); *see also Miller v. Abbott Lab'ys*, 648 F. App'x 555, 563 (6th Cir. 2016) ("Given our conclusion that [the plaintiff] has failed to [establish] … whether she engaged in protected activity, we need not address the other prongs required to establish a prima facie case [of retaliation under the FCA]."). Finding that an amendment to Plaintiff's claims would be futile, the Court therefore **DISMISSES** Count I **WITH PREJUDICE**.[3]

### B. Count II: Wrongful Termination in Violation of Public Policy under 31 U.S.C. § 3730(h)

In Count II of the Amended Complaint, Plaintiff alleges a claim under Ohio common law for wrongful termination in violation of public policy pursuant to 31 U.S.C. § 3730(h). Am. Compl., ¶¶ 30–34.

This claim fails because its viability hinges on the underlying statutory claim for retaliation under the FCA—Count I. The Sixth Circuit and the Ohio Supreme Court have both held that "a plaintiff cannot state a claim for wrongful discharge in violation of public policy unless he or she is able to establish a violation of the underlying source of that policy." *Shingler v. Smile Care, LLC*, No. 1:14-cv-725, 2015 WL 3935943, at *4 (N.D. Ohio June 26, 2015) (citing *Yuhasz*, 341 F.3d at 569); *see also Arsham–Brenner v. Grande Point Health Care Cmty.*, No. 74835, 2000 WL 968790, at *7 (8th Dist., July 13 2000) ("[W]hen the employee's discharge is not actionable under the law that establishes the 'clear public policy,' the

---

[3] Notwithstanding Rule 15's liberal policy of granting leave to amend "when justice so requires," *see* Fed. R. Civ. P. 15(a)(2), a court may otherwise deny opportunity to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] *futility of the amendment*." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added).

companion common law claim for relief likewise fails as a matter of law.") (citing *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 154 (1997)).

Because Count II is a companion Ohio common law claim for relief pursuant to Count I, and because the Amended Complaint fails to state a claim for retaliation under the FCA, Plaintiff's "common law public policy claim also must be dismissed." *Yuhasz*, 341 F.3d at 569. The Court therefore **DISMISSES** Count II **WITHOUT PREJUDICE**.

### C. Counts III and IV: Violation of R.C. § 4113.52, Ohio Whistleblower Protection Act ("OWPA"), and Wrongful Termination in Violation of Public Policy under R.C. § 4113.52(A)

A district court "may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it possessed original jurisdiction." *Cabotage v. Ohio Hosp. for Psychiatry, LLC*, No. 2:11-cv-50, 2013 WL 1281940, at *7 (S.D. Ohio Mar. 26, 2013) (citations omitted); *see also Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim [if] … the district court has dismissed all claims over which it has original jurisdiction."). Further, the Sixth Circuit has stated that where the federal claims are dismissed before trial, the state law claims should generally be dismissed as well. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("[The] usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of [before trial]."); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("If the federal claims are dismissed before trial … the state claims should be dismissed as well.").

Because the instant case is still in "the nascent stages of litigation, no factual findings have yet been made, and Ohio courts are better equipped to adjudicate claims based on the

public policy of the state, among other things, the factors of judicial economy, convenience, fairness and comity weigh against exercising supplemental jurisdiction in this case." *Kem v. Bering Straits Info. Tech.*, No. 2:14-cv-263, 2014 WL 5448402, at *5 (S.D. Ohio Oct. 22, 2014); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims ... [r]esidual jurisdiction should be exercised only in cases where the 'interests of judicial economy and the avoidance of multiplicity of litigation' outweigh our concern over 'needlessly deciding state law issues.'") (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)).

Having dismissed Plaintiff's federal claim (Count I), the Court declines to exercise supplemental jurisdiction over the pendant state law claims asserted against Defendant. The Court **DISMISSES** Counts III and IV **WITHOUT PREJUDICE**.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss. Doc. 8. The claim for retaliation under the False Claims Act, 31 U.S.C. § 3730, *et seq.*, (Count I) is **DISMISSED WITH PREJUDICE**. The pendant state law claims (Counts II, III, and IV) are **DISMISSED WITHOUT PREJUDICE** to being filed in state court. The Clerk is **DIRECTED** to enter judgment accordingly and **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio, Western Division.

**IT IS SO ORDERED.**

August 22, 2025

Jeffery P. Hopkins
United States District Judge

23